## JACKSON, ANN ARBOR & DETROIT RAILWAY CO. *v.* ANN ARBOR RAILROAD CO.

EQUITY—EVIDENCE—BONDS—TITLE—CONTRACTS.

Suit was brought by complainant, an electric railway corporation, against defendant railroad company for seven bonds, of $1,000 each, deposited to secure the payment of $10,000, which the J., A. A. & D. Ry. Co. agreed to contribute towards the elevation of tracks and separation of grades of the defendant at a certain street crossing in Ann Arbor. The railroad company undertook to do the work of grade separation, and to locate its package freight house as provided in the contract, and to construct a viaduct that would allow a separation of grades at a height of 15 feet, and complainant claims that the contract provisions have never been carried out. *Held*, that the original contract had been modified by later arrangements of the two corporations, as shown by defendant's evidence, that the testimony showed a complete performance of all that the complainant had demanded, and the railroad company should be permitted to keep the securities transferred to said corporation as payment for the labor, etc., performed.

Appeal from Jackson; Parkinson, J. Submitted January 12, 1916. (Docket No. 107.) Decided March 30, 1916.

Bill by the Jackson, Ann Arbor & Detroit Railway Company against the Ann Arbor Railroad Company for a decree declaring said defendant a trustee holding in trust certain bonds for the benefit of complainant, and for an accounting. From a decree for complainant, defendant appeals. Reversed.

*Bernard J. Onen* (*George W. Mechem*, of counsel), for complainant.

*Alex. L. Smith*, for defendant.

MOORE, J. This bill of complaint was filed in February, 1914. The trial court filed an elaborate opinion, in which he states the question involved as follows:

"The complainant seeks to recover of the defendant seven $1,000 bonds, and $190 in cash, which came to the possession of the defendant in 1907, which bonds are known as Detroit, Jackson & Chicago Railway consolidated mortgage 5 per cent. 30-year gold bonds, dated February 1, 1907, guaranteed by the Detroit United Railway Company, together with the installments of interest since accruing and paid to defendant.

"Complainant insists these bonds are the last of several exchanges or substitutes, which defendant received from time to time, commencing with 20 first mortgage bonds of the Jackson & Ann Arbor Railway Company, delivered to defendant by W. A. Boland as collateral security for the payment of $10,000, provided to be paid to defendant by the Jackson & Ann Arbor Railway Company, as set forth in an agreement between the two companies dated the 1st day of January, 1903; that while the $10,000 has never been paid, the defendant never did the work contemplated, and was never called upon to spend any money or financially obligate itself under such agreement, was never entitled to the $10,000, and is not so entitled, and should be required to account for or surrender said

bonds and account for the interest collected by it thereon and the $190 in cash.

"The defendant denies the aforesaid claims of complainant, denies that it received and holds said $7,000 in bonds and $190 in cash as collateral security, but as its own property; that such property is not impressed with any trust whatsover in favor of the complainant, and that complainant has not any interest therein or any right to a surrender of the same or to any accounting in respect thereto, or any interest accrued thereon, or to any return of such bonds or cash, or any avails thereof."

He made a decree sustaining the contention of the complainant. The case is brought here by appeal.

The question which should control the case is one of fact. The Jackson & Ann Arbor Railway Company, the predecessor of complainant, in January, 1903, and prior thereto, attempted to construct an electric railway from Jackson into the city of Ann Arbor, and had acquired rights of way, and expended considerable money in acquiring and constructing its property. It had also a bond issue. Mr. W. A. Boland was actively engaged in promoting the road. The city of Ann Arbor granted to him and to his successors and assigns a franchise to operate said railway in the city from the west corporation line of the city southeasterly along a private right of way to the westerly extremity of Ann street. It was necessary to cross the tracks of the defendant railway company, and negotiations were entered into to procure a crossing. The defendant had entered into a contract with Mr. Hawks, relative to the crossing of the defendant's railroad by his line. The city of Ann Arbor in October, 1902, granted a permissive ordinance, allowing defendant to raise its grade and build viaducts, and if it built a viaduct at Ann street the city was to reimburse it. As a result of the negotiations a contract was entered into as follows:

"This agreement made this first day of January, 1903, by and between the Ann Arbor Railroad Company, party of the first part, and the Jackson & Ann Arbor Railway Company and William A. Boland, party of the second part, witnesseth, that: Whereas, on the first day of October, 1902, the common council of the city of Ann Arbor duly passed an ordinance entitled:

" 'An ordinance relative to changing the course and grade of certain streets and elevating the tracks of the Ann Arbor Railroad;'

whereas said ordinance provides among other things that the Ann Arbor Railroad Company shall provide an opening fourteen feet in the clear, above the present surface level of its tracks in the place where Ann street extended would meet and intersect said Ann Arbor Railroad Company's tracks; and fifteen feet in the clear above the present surface level of its tracks at the intersection of Miller Avenue with said tracks; and whereas said first party is willing to accept the said ordinance and undertakes the performance of the work provided in said ordinance to be done by said first party, and the obligations imposed by this contract on condition that the second party shall contribute ten thousand dollars towards the expenses thereof; and whereas said second party is willing to make such contribution: Now, therefore, it is agreed:

"*First.* That the first party will undertake and perform the work of separation of grades provided in the ordinance hereinbefore mentioned.

"*Second.* That the first party will locate its city package freighthouse adjacent to Miller avenue and First street in such position that the tracks of said second party's proposed railroad can be connected with the freight house tracks of said first party.

"*Third.* When the steel viaduct over said Ann street extended, provided for in section five of said ordinance, shall have been constructed by said first party, as therein provided, in such wise as to give a clearance of fourteen feet above the present surface level of the tracks of said first party at the point where Ann street extended would intersect said tracks, or (in the event that the railroad of the second party shall be constructed on Miller avenue) when said viaduct over Miller

avenue shall have been constructed by the first party, so as to give a clearance of fifteen feet above the present surface level of the rails of said first party as now located in Miller avenue, and when said first party shall have constructed its city freight package warehouse adjacent to Miller avenue and First street as provided by the second article of this agreement, then the party of the second part will pay to the party of the first part the sum of ($10,000) ten thousand dollars.

"ANN ARBOR R. R. CO.,
"By H. W. ASHLEY, Asst. Pres.
. "JACKSON & ANN ARBOR RY. CO.,
"By WORRALL WILSON, President.
"Attest: JAMES B. FOOTE, Secy.

"We, and each of us, do hereby guarantee the faithful performance by the Jackson & Ann Arbor Railway Company, and William A. Boland, of all and singular the obligations of the above contract by it to be done and performed, including the payment of the money herein specified.

[Signed]    "WILLIAM A. BOLAND.
[Signed]    "P. H. FLYNN.
[Signed]    "DAVID E. LEWIS.
[Signed]    "FRED C. COCHEN.
"Witness: S. M. RICHARDSON."

As additional security for the performance of this contract 20 of the bonds which had been issued, of the face value of $1,000, were delivered to the defendant company, and it entered upon the work of elevating its tracks. In the meantime Mr. Boland was having trouble with the financial part of his enterprise, and an arrangement was made for its reorganization, and one William Halls, Jr., was to underwrite the bonds of the road at 85 per cent., and a new arrangement was made, as shown by an agreement reading as follows: .

"Whereas, on the first day of January, 1903, an agreement was made between the Ann Arbor Railroad Company of the one part and the Jackson and Ann Arbor Railway Company and William A. Boland of the other part, providing among other things that the

Ann Arbor Railroad Company should undertake and perform the work of separation of grades provided for in a certain ordinance passed by the common council of the city of Ann Arbor on the 1st day of October, 1902, and that on the completion of certain portions of such work the said Jackson and Ann Arbor Railway Company and said William A. Boland should pay to said Ann Arbor Railroad Company the sum of ten thousand dollars; and whereas, certain bonds were deposited by said second parties to said contract with said Ann Arbor Railroad Company to secure the performance by said second parties of the obligation of said contract upon their part; and whereas the performance of said contract on the part of said second parties was guaranteed by certain other parties; and whereas, the said Jackson and Ann Arbor Railway Company and said William A. Boland are desirous of having said contract canceled and said securities surrendered and said guarantors released from the obligation thereof:

"Now, therefore, it is agreed by and between said Ann Arbor Railroad Company, party of the first part hereto, and said William A. Boland and the Jackson and Ann Arbor Railway Company, parties of the second part:

"*First.* That said contract of January 1, 1903, and all obligations imposed thereby upon either of the parties hereto, be and the same are hereby canceled, released and discharged.

"*Second.* The Ann Arbor Railroad Company shall and does now surrender to said William A. Boland and the Jackson and Ann Arbor Railway Company all the bonds deposited with it as collateral security as aforesaid and release the guarantors of said contract from all obligation by reason thereof.

"*Third.* In consideration of the premises the said William A. Boland and the Jackson and Ann Arbor Railway Company do hereby assign and transfer to the Ann Arbor Railroad Company absolutely the following bonds, to wit: Twelve bonds of the newly organized company known as the Jackson, Ann Arbor & Detroit Traction Company, being the same bonds underwritten by Wm. Halls, Jr., and others at 85%.

"*Fourth.* As a consideration, in addition to those

hereinbefore recited, the Ann Arbor Railroad Company agrees that it will provide a clear headroom, below its track, on Miller avenue of not less than fourteen feet.

"JACKSON, ANN ARBOR RAILWAY CO.,
"By W. A. BOLAND, Attorney for President.
"Attest: ....................

"ANN ARBOR R. R. CO.,
"By H. W. ASHLEY, Asst. to Pres.
"Attest: ....................
"I hereby guarantee the within contracts.
[Seal]                          "W. A. BOLAND."

For the purpose of carrying out this agreement the 20 bonds were forwarded by the Ann Arbor Railroad Company to the Hanover National Bank, with instruction to deliver them to the Jackson & Ann Arbor Railroad Company when the 12 bonds mentioned in the second contract were delivered to the bank for the Ann Arbor Railroad Company. For some reason the arrangement with Mr. Halls was not consummated, and after a time the 20 bonds were returned by the bank to the defendant. In a further effort to relieve the financial situation in July, 1905, a contract was made by the company with Mr. Boland and one Potter, by which they undertook to reorganize the road and to retire the $650,000 of bonds of the company by issuing for the bonds preferred stock of the company to an amount equal to 40 per cent. of the face value of the bonds. In this contract it was agreed:

"The company further agrees that in consideration of the services rendered and to be rendered by said parties of the second part, and on their procuring to be satisfied and canceled the bonded indebtedness of six hundred fifty thousand dollars aforesaid, and to be paid and satisfied the balance owing on said seventy five thousand dollar note, to cause to be issued to said parties of the second part, or as they shall direct, the balance of two hundred fifteen thousand dollars of its common stock and the two hundred sixty thousand

dollars of its preferred stock to be authorized by such amendment of its articles of association."

In September, 1905, a special meeting of the stockholders was held to consider this contract. In the record of that meeting appears the following:

"President Wilson further reported that he was advised by Mr. Boland and Mr. Potter that they have procured to be deposited with the Hamilton Trust Company, as trustee, a large proportion of the outstanding bonds of this company to be exchanged for stock of this company,. and that it is reasonably certain all the bondholders will consent to exchange their bonds for stock. * * * Resolved that the action of the officers of this company in executing the contract under date of July 1, 1905, with W. A. Boland and N. S. Potter, a copy of which contract is set forth in the minutes of the meeting of the stockholders this day held, and all action of such officers in pursuance of such contract, be and the same are hereby ratified, approved and confirmed."

In pursuance of the plan outlined above the bondholders, including the defendant company, surrendered their bonds, and the defendant received for its bonds preferred stock to the amount of $8,000 and the $240,-000 of common stock was issued to Boland and Potter. In 1906 a further reorganization occurred, by which all of the stock, both preferred and common, of the Jackson & Ann Arbor Railway Company was to be exchanged for a like amount of preferred and common stock of the Jackson, Ann Arbor & Detroit Railway Company. The defendant company made the exchange of its 80 shares of preferred stock for a like amount of preferred stock in the new company. As part of this transaction the Jackson & Ann Arbor Railway Company deeded all of its assets to the Jackson, Ann Arbor & Detroit Railway Company. In 1907 the last named company made an agreement with the Detroit, Jackson & Chicago Railway Company and the Detroit United Railway. It is unnecessary to set out the details

of this agreement, but it resulted in the defendant company exchanging its $8,000 preferred stock for seven $1,000 bonds of the Detroit, Jackson & Chicago Railway Company, guaranteed by the Detroit United Railway Company, and $190 in money.

Mr. Ashley was examined as a witness. He was testifying about the freighthouse:

"*Q.* Was it located at that time adjacent to Miller avenue and First street?

"*A.* No, sir; about three-fourths of a mile or half a mile.

"*Q.* It remains now where it was at the time the contract was made?

"*A.* Yes, sir. We undertook to change the location, provided this road was completed."

His attention was called to a letter he had written to Mr. Warren:

"*Q.* And that was true, was it not, Mr. Ashley, that the Ann Arbor was never called upon to expend any money, or in any way financially obligate itself in this transaction?

"*A.* That was true, so far as Ann street and the warehouse was concerned, but the whole elevation of the Ann Arbor was projected on this, and the tracks were located for Boylan's Company, which probably would not have been done, but we were put in this contingency: Here was two street railroads going to intersect the Ann Arbor; one of them proposed to go over, and the other at grade. That would have forever fixed the grade of the Ann Arbor Railroad through that city, and no such thing as elevation had been considered, up to that time.

"*Q.* Up to what time?

"*A.* Up to the time of the happening of these negotiations for these crossings.

"*Q.* You then undertook to make this elevation that would cost about $90,000?

"*A.* I think something of that kind, provided, and only provided, that these two companies would undertake to contribute towards the elevation.

190 Mich.—37.

"*Q.* You did that in view of the ordinance which had been passed?

"*A.* No, sir; these negotiations were all made, although the contracts were not made, the negotiations were made before the ordinance. * * *

"*Q.* But the things you were to do as called for by the contract, that is, the building of the viaduct at Ann street and the extension of your freight depot, whereas you never did anything of that kind?

"*A.* Those two things we didn't. We elevated the railroad and put in a viaduct at Miller avenue. We did two things and didn't do two others.

"*Q.* Now this was also true, was it not, as stated by you at that time: That the surrender of title to a certain number of these bonds was a voluntary act on the part of Mr. Boland—his own proposition, I believe—and was accepted by me with the knowledge that in all probability the line would never make any financial requirements whatever upon the Ann Arbor Company?

"*A.* Yes, sir; because at that time, when this exchange was made, I had a number of talks with Mr. Boland. He stated to me he concluded Miller avenue would be the best crossing.

"*Q.* It was never built on Miller avenue?

"*A.* It was never built at all."

The record discloses that no demand was ever made upon the defendant company in relation to the freighthouse. No payment was ever made to the defendant company for what it had done, except as the result of what we have narrated. We think it clear from what we have stated that defendant company incurred nearly all of the expense contemplated by its first agreement. We think it equally clear that the second agreement did away with the first agreement. What was done subsequent to that time is consistent with this conclusion, and is utterly inconsistent with the claim that the first contract was controlling. If it was controlling, why did not the company, instead of proposing an exchange of the bonds for preferred stock, insist upon their surrender? If it was claimed that

the first issue of the preferred stock was held by defendant as trustee for the Boland road, why was it not so asserted, instead of proposing its exchange for the second issue of preferred stock? These same inquiries are pertinent as to the exchange of preferred stock for the guaranteed bonds.

The defendant company did all it was ever called to do. It never was paid the $10,000, agreed to be paid, but it has received in lieu thereof the seven $1,000 bonds and $190 in money.

We think the decree of the court below was wrong. It is reversed, and one will be entered here, dismissing the bill of complaint, with costs of both courts.

STONE, C. J., and KUHN, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred. OSTRANDER, J., did not sit.